UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

 HEATHER LAMB,

        Plaintiff,

      v.                                  5:05-CV-239

COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

HOWARD G. MUNSON
Senior United States District Judge

## DECISION and ORDER

      Plaintiff commenced this action seeking judicial review of a decision by the Commissioner of Social Security denying disability insurance benefits ("DIB") and supplemental security income ("SSI").  The Plaintiff requests that this Court reverse the decision and remand to the Administrative Law Judge to further develop the record. The Commissioner seeks to affirm the decision.  This Court has jurisdiction to review an unfavorable decision of the Commissioner under 42 U.S.C. § 405(g).  This Court finds that the ALJ's decision was based in part on an application of incorrect legal standards and grants Plaintiff's request to remand the case for further consideration.

**I.    FACTS**

Procedural History

      Plaintiff alleges that he became disabled on January 11, 1996 due to rheumatic valvular disease, aortic regurgitation, mitral valve prolapse, mild mitral regurgitation,

recurrent migraine headaches, panic attacks, depression, anxiety disorder, and adjustment disorder.  (R. at 96, 98, 137, 162-66, 223, 230-34, 266; Plaintiff's Br., Dkt. No. 10, at 2).

On May 10, 1999, Plaintiff filed for Social Security Disability Insurance benefits ("DIB") and Supplemental Security Income ("SSI") benefits.  (R. at 54).  She alleged disability as of September 1, 1997, with a last insured date of March 31, 2000.  (R. at 16, 57).  Her applications were denied initially on August 30, 1999 and on reconsideration on December 16, 1999.  (R. at 26-27).  On December 21, 2000, a hearing was held before an Administrative Law Judge ("ALJ"), who issued a partially favorable decision on January 24, 2002, finding that Plaintiff was disabled, but not prior to March 30, 2001, the date a consultative psychological evaluation was performed.  (R. at 12, 21, 194).  On January 8, 2005, the Appeals Council denied Plaintiff's request for review and the ALJ's decision thus became the final decision of the Commissioner.  (R. at 9).  Plaintiff commenced this action on February 25, 2005 and the Commissioner answered on June 20, 2005.  (Dkt. Nos. 1, 6).

Non-Medical Evidence

Plaintiff was twenty-two years old at the time of the hearing.  (R. at 54).  She completed high school, and her past work experience includes that as a babysitter and cashier.  (R. at 17).  At the hearing, she testified that she is married with one child, and lives with her husband and child.  (R. at 203).  She has a license and drives approximately four times per month.  (R. at 205).

In terms of work history, Plaintiff worked as an ice cream store clerk from September 1996 through July 1997.  (R. at 206).  This job involved lifting ten pounds.

2

(R. at 206).  Plaintiff worked as a convenient store cashier from June of 1997 through August of 1997, when she was fired for missing too many days as a result of being ill. (R. at 208-09).  The cashier job involved sitting for five out of six hours in a six-hour work day.  (R. at 209).  After the cashier job, Plaintiff went back to work for three weeks at a restaurant, where she lifted a maximum of ten pounds and stood for six to seven hours a day with a half-hour break.  (R. at 211-12).

Plaintiff worked at a rehabilitation center for disabled individuals as direct care staff, from October 1997 through December 1997.  (R. at 213).  This job involved sitting for three hours and standing for five to six hours in nine-hour shifts, and lifting a maximum of twenty pounds.  (R. at 215-16).  Plaintiff was fired from this job taking too many sick days.  (R. at 216-17).  Plaintiff then worked from August 1998 through December 1998 as a cashier, where she sat for one hour per eight-hour work day and lifted a maximum of twenty pounds.  (R. at 216).  She testified that she also missed many days from this job because of calling in sick for migraines.  (R. at 219).  She became pregnant in November of 1998, and quit the cashier job on recommendation from her gynecologist, who assessed her pregnancy as high risk.  (R. at 220). Thereafter, Plaintiff never went back to work.  (R. at 220).

Plaintiff testified that she was hospitalized in September of 1997 for a gastrointestinal infection.  (R. at 210-11).  She testified that she suffers from aortic regurgitation, which causes her to have severe chest pains, lasting thirty minutes each, once or twice per week.  (R. at 223-25).  She takes Toprol for this condition, which regulates her heartbeat but does not alleviate the pain from the attacks.  (R. at 225). She testified that the Toprol caused her to be fatigued.  (R. at 239).  Plaintiff also

3

testified that she suffers from mitral valve prolapse, for which the Toprol is also prescribed.  (R. at 235).

Plaintiff testified that she suffers from severe migraine headaches which cause pain that she compared to being in labor.  (R. at 230).  These migraines occur once or twice per week and last from six hours to two days.  (R. at 231).  Plaintiff takes Imitrex or Multex for her migraine pain, and when this does not work she goes to her doctor for an injection of Imitrex, a more potent medication.  (R. at 232).  Plaintiff testified that with her migraines she experiences nausea, dizziness, and vision problems.  (R. at 233-34). Plaintiff stated that extreme heat and odors are among the causes of her migraines. (R. at 245).

Plaintiff testified that she is able to sit for two hours maximum, and stand for forty-five minutes maximum.  (R. at 240).  She estimated that she can walk 100 meters before becoming fatigued, and lift but not carry ten to twenty pounds.  (R. at 240).  She stated that she is able to bend, stoop, crouch, kneel, crawl, climb stairs and ladders, but that dizziness causes her to frequently lose her balance.  (R. at 242-43).  She testified to being able to dress and feed herself, perform some limited child care with help from her parents, do some limited cooking and dishwashing, make a bed, sweep, vacuum, read, and watch television.  (R. at 247-48).  She stated that she is unable to grocery shop, do laundry, or clean.  (R. at 248, 258).

Plaintiff stated that she has short-term memory problems and problems concentrating.  (R. at 246).  She also testified to getting panic attacks, which make her feel like she will pass out.  (R. at 266-67).

<u>Medical Evidence</u>

4

*Dr. Humayun Mirza*

Plaintiff treated with Dr. Humayun Mirza from January of 1997 through the time of the hearing.  (R. at 94-110, 135-36).  On January 7, 1997, Dr. Mirza noted that Cefergot was not helping with Plaintiff's headaches.  (R. at 94).  She was prescribed Imitrex instead.  (R. at 94).  On January 25, 1997, Dr. Mirza noted that Plaintiff was fatigued and that she was suffering from palpitations.  (R. at 99).  On May 14, 1997, Plaintiff reported to Dr. Mirza with a migraine headache for which Imitrex would not help; Dr. Mirza gave her an injection of Nubain and Vistaril to alleviate her headache. (R. at 96).

An electrocardiogram ("ECG") performed by Dr. Mirza on September 19, 1997 confirmed that Plaintiff suffered from rheumatic aortic valvular disease with mild to moderate aortic regurgitation, rheumatic mitral valve disease with mitral valve prolapse and mild mitral regurgitation, and trace tricuspid regurgitation with normal pulmonary systolic pressure.  (R. at 107).

Plaintiff saw Dr. Mirza again on December 16, 1997, and complained of fatigue, which Dr. Mirza attributed to her odd work hours and lack of sleep during the day when she was home.  (R. at 99).  On December 30, 1997, Dr. Mirza noted a diastolic murmur consistent with aortic regurgitation, and an audible mid systolic click at the mitral area. (R. at 100).  On February 24, 1998 Plaintiff had been started on Toprol and Nifedipine for her heart conditions.  (R. at 101).  On that date she underwent a stress test to gauge her exercise tolerance, which was described as "excellent."  (R. at 101).

On March 25, 1998, Plaintiff was examined by Dr. Mirza and noted to be pregnant.  (R. at 101).  On April 22, 1998, Plaintiff saw Dr. Mirza again and reported

that her gynecologist had told her the fetus was not moving.  (R. at 102).  Dr. Mirza noted on April 28, 1998 that Plaintiff had miscarried.  (R. at 102).  He restarted her on Toprol, Procardia, and Zocor for her heart conditions, medications she had not been taking during her pregnancy.  (R. at 102).

On September 29, 1998 Plaintiff was seen by Dr. Mirza, who noted that she had stopped taking her medications and gone to the Emergency Room for "terrible 'palpitations.'" (R. at 103).  Dr. Mirza started her on heart medications once again.  (R. at 103).  On examination she was found to have an audible heart murmur.  (R. at 103).  On October 6, 1998, Dr. Mirza noted that Plaintiff was smoking one-half to one pack of cigarettes per day.  (R. at 103).  Dr. Mirza stated that Plaintiff suffered from "moderate to severe" aortic regurgitation.  (R. at 103).  She was noted to have a "very soft" diastolic murmur.  (R. at 103).  Plaintiff was put back on Toprol and continued to take Plendil and Zocor for her heart condition.  (R. at 103).  She was also prescribed Restoril as a sleep aid.  (R. at 103).

On October 21, 1998, Dr. Mirza once again noted Plaintiff's moderate to severe aortic regurgitation.  (R. at 104).  He stated that she was doing "much better" on her medications and that she had stopped smoking for three days.  (R. at 104).  She had a soft diastolic murmur.  (R. at 104).  Dr. Mirza's impression of Plaintiff's condition was that it had improved and that she had no heart palpitations at that time.  (R. at 104).  On November 3, 1998, Plaintiff's heart palpitations were stable with medication and she had stopped smoking.  (R. at 104).  Another ECG taken on November 5, 1998 indicated there had been no change since the previous ECG taken on September 19, 1997.  (R. at 110).

6

On December 16, 1998, Dr. Mirza noted that Plaintiff was once again pregnant. (R. at 105). Dr. Mirza stated that Plaintiff had rheumatic valvular heart disease and mild to moderate aortic regurgitation which "remained stable over the year on current management." (R. at 105). Because of Plaintiff's pregnancy, Dr. Mirza took her off Zocor, but was reluctant to take her off Toprol because of the symptoms she would experience, which he stated were likely to include "a fair amount of symptoms, shortness of breath, [and] palpitations." (R. at 105).

Plaintiff saw Dr. Mirza again on May 5, 1999; Dr. Mirza noted evidence of mitral and aortic regurgitation in her cardiac exam, with no clicks, rubs, or gallops detected. (R. at 135). Dr. Mirza opined that she was doing well in her pregnancy, off her medications. (R. at 135). Plaintiff was examined again on October 12, 1999, reporting an uneventful pregnancy. (R. at 136). She reported experiencing more frequent migraines, for which she was given Maxalt samples. (R. at 136). She was started on Inderal instead of Toprol for her heart palpitations and migraines. (R. at 136). An ECG administered on June 10, 1999 showed no change from the previous two ECGs. (R. at 158).

*Carthage Hospital*

Plaintiff was treated at Carthage Hospital on three occasions. (R. at 111-34, 141-45). The first admission lasted from September 15, 1997 through September 18, 1997. (R. at 111-25). At that time Plaintiff was treated with IV hydration and antibiotics. (R. at 112). Plaintiff was administered the aforementioned ECG of September 19, 1997, which showed rheumatic aortic valvular disease with mild to moderate aortic regurgitation, rheumatic mitral valve disease with mitral valve prolapse and mild mitral

7

regurgitation, and trace tricuspid regurgitation with normal pulmonary systolic pressure. (R. at 107).

Plaintiff was admitted to Carthage Hospital again from April 22, 1998 through April 23, 1998. (R. at 126-34). At that time she complained of abdominal pain and cramping with some vaginal bleeding, and ultimately suffered a miscarriage. (R. at 127). Plaintiff's last admission to Carthage Hospital was for the birth of her son, which was an uneventful delivery. (R. at 141-45).

*Dr. Saleem*

Dr. Muhammad Saleem performed a psychiatric examination of Plaintiff on March 30, 2001. (R. at 162-67). Dr. Saleem stated that Plaintiff's mood was anxious and her affect was constricted; her thought process was goal-directed and relevant; her ability to abstract was poor; she was alert and oriented to time, place, and person; her remote and immediate memories were intact; her recent memory, attention, and concentration were decreased; and her insight and judgment were fair. (R. at 163).

Plaintiff reported feeling depressed, hopeless and helpless, and stated that she cried frequently. (R. at 162). She also stated that she felt anxious and panicky at times, hyperventilated occasionally, and did not want to leave her house. (R. at 162). She reported that her father physically abused her as a child and that she was sexually assaulted at age six. (R. at 162). She reported that she watched television during the day, and needed her sister to help her with the housework as she got out of breath very easily and frequently. (R. at 163). She helped her husband get ready for work and went shopping occasionally with her husband. (R. at 163). She also reported that she had a nurse who stopped into her home regularly to check on Plaintiff and her baby.

8

(R. at 163).

Dr. Saleem diagnosed Plaintiff with anxiety disorder and adjustment disorder with depressed mood.  (R. at 164).  He stated that she was not under mental health treatment but opined that she should begin seeing a mental health professional.  (R. at 164).  He gave her a "guarded" diagnosis due to medical problems, depression, and anxiety.  (R. at 164).

Dr. Saleem also completed a medical assessment of ability to do work-related activities.  (R. at 165-67).  In this assessment he concluded that Plaintiff had a fair ability to use judgment and interact with supervisors, a poor ability to follow work rules, relate to coworkers, deal with the public, deal with work stress, and maintain attention/concentration, and no ability to function independently.  (R. at 165).  He stated that Plaintiff had a poor ability to understand, remember and carry out complex job instructions; understand, remember and carry out detailed, but not complex job instructions; and understand, remember and carry out simple job instructions.  (R. at 166).  Plaintiff had a fair ability to maintain personal appearance, behave in an emotionally stable manner, and demonstrate reliability, and a poor ability to relate predictably in social situations.  (R. at 166).  Dr. Saleem also concluded that the results of his examination were consistent with Plaintiff's allegations of mental impairments. (R. at 166).

*Dr. Kasulke*

Plaintiff was consultatively examined by Dr. Robert Kasulke on June 29, 1999. (R. at 137-39).  At this time she was eight months pregnant.  (R. at 137).  She reported symptoms of shortness of breath and panic attacks, which occurred spontaneously and

generally resolved within thirty minutes.  (R. at 137).  These symptoms occurred about two to three times per week.  (R. at 137).  Dr. Kasulke noted "distant heart sounds" with a trace I/IV heart murmur at the root of the heart.  (R. at 138).  He described the physical examination as "basically benign."  (R. at 138).

Plaintiff was consultatively examined by Dr. Kasulke again on May 7, 2001.  (R. at 168-76).  Dr. Kasulke noted that Plaintiff continued to complain of palpitations and substantial chest pain related to deep breathing.  (R. at 169).  In a medical source statement dated June 25, 2001, Dr. Kasulke opined that Plaintiff could occasionally lift up to twenty pounds and frequently lift up to ten pounds, and frequently carry up to twenty pounds.  (R. at 173).

*Residual Functional Capacity Assessment*

On December 16, 1999, a Residual Functional Capacity ("RFC") Assessment was completed by a non-treating, non-examining physician.  (R. at 147-53).  At that time Plaintiff was eight months pregnant.  (R. at 149).  This assessment found that Plaintiff retained the ability to occasionally lift fifty pounds and frequently lift twenty-five pounds; stand, walk, and/or sit for about six hours in an eight-hour workday; and push and/or pull to an unlimited extent.  (R. at 148).  She was assessed with the ability to frequently stoop and crouch, occasionally climb and balance, and never kneel or crawl.  (R. at 149).  She did not have any manipulative, visual, communicative, or environmental limitations.  (R. at 150-51).

## II.    STANDARD OF REVIEW

A court examining a denial of disability benefits must undertake a two-step

review.  First, a court must determine whether the administrative law judge applied the correct legal standards.  Rosado v. Sullivan, 805 F. Supp. 147 (S.D.N.Y. 1992)(*citing* Johnson v. Bowen, 817 F.2d 983, 985 (2d Cir. 1987).  Second, a court must decide whether the ALJ's findings of fact are supported by substantial evidence.  42 U.S.C. § 405(g); Rivera v. Sullivan, 923 F.2d 964, 967 (2d Cir. 1991).

The substantial evidence standard presents a low threshold.  Substantial evidence is evidence that a reasonable person would find adequate to support a conclusion.  Williams on Behalf of Williams v. Bowen, 859 F.2d 255, 258 (2d Cir. 1988)(*citing* Richardson v. Perales, 402 U.S. 389, 401 (1971)).  There need not be a preponderance of evidence.  Schauer v. Schweiker, 675 F.2d 55, 57 (2d Cir. 1982).  A reviewing court may find substantial support although there is contradictory evidence permitting conflicting inferences.  Snell v.Apfel, 177 F.3d 128, 132 (2d Cir. 1999)(*citing* Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983)).  Indeed, under this standard, the same body of evidence may adequately support contradictory findings.  Schauer, 675 F.2d at 57.  A reviewing court may not examine the evidence *de novo* or substitute its own interpretation for that of the ALJ.  Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982).

The opinion of a treating physician is entitled to controlling weight if the opinion is supported by objective medical findings and not contradicted by substantial evidence in the record.  20 C.F.R. § 1527(d)(2); Carroll v. Sec'y of Health and Human Servs., 705 F.2d 638, 642 (2d Cir. 1983).  However, the evaluations of non-examining State agency medical and psychological consultants may constitute substantial evidence.  See

Schisler v.Sullivan, 3 F.3d 563, 568 (2d Cir. 1993)(holding that opinions of non-examining physicians are substantial evidence if they are in turn supported by evidence in the record).  An ALJ must treat such evaluations as expert opinion evidence of non-examining sources.  Social Security Ruling ("SSR") 96-6p, 1996 WL 374180, at *1; 20 CFR 404.1527(f).  This treatment extends to consultants' RFC assessments.  SSR 96-6p, at *4.  State agency consultants are experts in evaluating the medical issues of disability claims.  Id. at *2.  However, because such consultants do not have a treating relationship with the claimant, and because they might be unduly influenced by institutional demands, the ALJ gives their opinions weight only insofar as the record supports.  Id. at *3.

## III. DISCUSSION

A.  Governing Law

A court may grant disability insurance benefits only if an individual meets insured status criteria.  42 U.S.C. § 423(a).  Moreover, an individual must be "disabled."  Id. at § 423(A)(1)(E).  Under the Social Security Act, an individual is disabled if he or she is unable to engage in "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  Id. at 423(d)(1)(A).

To determine whether an individual is disabled under the Act, the Commissioner undertakes a five-step analysis.  First, the Commissioner decides whether the applicant is currently engaged in substantial gainful activity.  20 C.F.R. § 404.1520(a)(4)(I).  If not,

the Commissioner considers whether the applicant has a "severe" impairment that significantly limits his or her ability to do "basic work activities."  Id. at § 404.1520(a)(4)(ii), 404.1520(c).  If the applicant alleges more than one impairment, the Commissioner must individually evaluate each impairment for severity.  See id. at § 404.1520(a)(4).  However, an ALJ's failure to make specific findings as to each impairment is harmless error if the record clearly reflects that the ALJ has considered each impairment before deciding that the applicant's condition is not severe.  See Smith v. Sullivan, 726 F. Supp. 261 (D. Neb. 1989).

Third, if the Commissioner finds that an individual's impairment or combined impairments are severe, the Commissioner next determines whether these limitations meet or equal the impairments listed in Appendix 1 of the Regulations.  20 C.F.R. § 404.1520(a)(4)(iii).  If an impairment meets or equals one of the listings, the Commissioner considers the applicant to be disabled.  Id.  If not, the Commissioner then considers the applicant's residual functional capacity ("RFC")[1] and whether he or she can still do past relevant work.  Id. at § 404.1520(a)(4)(iv).

In determining an individual's residual functional capacity, the Commissioner must consider objective medical evidence, including medical facts, diagnoses, and opinions.  Id. at § 404.1545(a)(3).  A decision must also account for the applicant's

---

[1]  The Act defines "residual functional capacity" as follows: "Your impairment(s), and any related symptoms, such as pain, may cause physical and mental limitations that affect what you can do in a work setting.  Your residual functional capacity is what you can still do despite your limitations."  20 C.F.R. § 404.1545(a)(1).  The Commissioner particularly focuses on whether the individual meets physical exertional requirements of sedentary, light, medium, heavy, or very heavy work.  20 C.F.R. § 404.1567.

testimony, including an individual's description of his symptoms such as pain.  Id.; see also Charlebois v. Comm'r, No. 02 Civ. 686, 2003 WL 22161591, at *8 (N.D.N.Y. Sept. 12, 2003).  The Commissioner must offer substantial evidence of every physical demand listed in the regulations to demonstrate that an individual can perform the full range of work at a particular physical level.  See Charlebois, 2003 WL 22161591, at *8; LaPorta v. Bowen, 737 F. Supp. 180, 183 (N.D.N.Y. 1990).

To find a residual functional capacity for light work, the Commissioner must find that a individual is able to lift no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds  20 C.F.R. § 404.1567(b).  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  Id.  To be considered capable of performing a full or wide range of light work, a claimant must have the ability to do substantially all of these activities.  Id.  If someone can do light work, they are presumed able to do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.  Id.

The applicant bears the initial burden of proving that he or she is disabled within the meaning of the Social Security Act.  42 U.S.C. § 423(d)(5)(A); Reyes v. Sec'y of Health and Human Servs., 807 F. Supp. 293, 298 (S.D.N.Y. 1992).  The applicant carries this burden by proving the first four steps of the analysis.  Rivera v. Schweiker, 717 F.2d 719, 722 (2d Cir. 1983).  Once an individual has proved that an impairment prevents him or her from returning to previous work, the burden shifts to the

Commissioner to prove that there exists other work in the national economy to which the applicant can adjust despite his or her limitations. 20 CFR § 404.1520(a)(4)(v); <u>see Rivera</u>, 717 F.2d at 722–23; <u>Reyes</u>, 807 F. Supp. at 298. Such work must exist in significant numbers in the national economy. 20 CFR § 404.1560(c). To determine whether other work exists to which a individual can adjust, the Commissioner considers an individual's RFC together with the individual's age, education, or work experience. <u>Id.</u> at § 404.1560(b)(3). If an individual is not capable of adjusting to other work, the individual is disabled. <u>Id.</u> at § 404.1520(a)(4)(v). If an individual is capable of adjusting to other work, such individual is not disabled. <u>Id.</u>

To prove that other work is available, the Commissioner may, under appropriate circumstances, rely on the Medical-Vocational Guidelines included in Appendix 2 of Subpart P of section 404. <u>Grey v. Chater</u>, 903 F. Supp. 293, 297–98 (N.D.N.Y. 1995). The Guidelines account for the applicant's residual functional capacity, age, education, and work experience.[2] Comparing these factors, the Guidelines indicate whether substantial gainful work exists to which the applicant can adjust.

The Guidelines are generally dispositive on the disability decision. <u>Grey</u>, 903 F. Supp. at 298. If the Guideline factors accurately describe an applicant's mental and physical condition, the Commissioner may rely exclusively upon these factors. <u>Id.</u> The

---

[2] The Guidelines classify work by five different categories—sedentary, light, medium, heavy, and very heavy—based upon the physical exertional requirements of that work. 20 C.F.R. Part 404, Subpart P, App'x 2. The Commissioner will place an individual into one of these categories based on his or her residual functional capacity. <u>Id.</u> § 200.00(a). The Commissioner then considers the applicant's age, education, and previous work experience to determine whether her or she is disabled. <u>Id.</u>

Guidelines accurately describe an applicant's condition if substantial evidence supports

the Commissioner's finding that the applicant can fully perform the exertional

requirements of the work.  See id. at 299–302 (ordering remand because evidence did

not support that the applicant could stand for two hours of a workday); see also Nelson

v. Bowen, 882 F.2d 45, 49 (2d Cir. 1989).  If not, the Commissioner must call a

vocational expert to testify whether other work exists that the applicant can perform

within his limitations.  See Nelson, 882 F.2d at 45.

B. Plaintiff's Arguments

        Plaintiff argues that this Court should reverse the Commissioner's decision and

remand to the Commissioner due to legal errors and insufficient evidence.  (Plaintiff's

Br. 10-12).  Plaintiff contends that (i) the Commissioner's decision to award disability

benefits as of March 30, 2001, and not as of September 15, 1997 (the date on which

her cardiac impairment was diagnosed) is not supported by substantial evidence, (ii) the

Commissioner failed to properly weigh the medical evidence of record and reach a

correct determination of plaintiff's RFC prior to March 30, 2001, (iii) the Commissioner

failed to properly assess the severity of Plaintiff's migraine headaches, and (iv) the

Commissioner failed to properly assess Plaintiff's credibility.  (Plaintiff's Br. at 9-21).

C.  Analysis

1.  Whether the Commissioner's Decision to Award Benefits as of March 30, 2001
Rather than September 15, 1997 Was Supported By Substantial Evidence.

        Plaintiff argues that the ALJ improperly decided that Plaintiff's disability onset

date was March 30, 2001, the date of Dr. Saleem's psychiatric examination, rather than

September 15, 1997, the date Plaintiff was diagnosed with cardiac problems. (Plaintiff's Br. at 9-12).  Specifically, Plaintiff contends that the ALJ failed to properly consider other medical evidence, obtained prior to March 30, 2001, which indicated that Plaintiff was having mental problems, and that the ALJ failed to properly investigate and collect evidence so as to determine Plaintiff's true disability onset date.  (Plaintiff's Br. at 9-12).

In his decision, the ALJ found that Plaintiff's rheumatic aortic valvular disease, aortic regurgitation, rheumatic mitral valve disease with mitral valve prolapse, anxiety disorder and adjustment disorder with depressed mood were "severe" impairments under the regulations.  (R. at 17).  The ALJ proceeded to conclude that prior to March 30, 2001, Plaintiff retained the RFC to perform light work, but as of March 30, 2001, based on Dr. Saleem's psychiatric evaluation Plaintiff was unable to perform jobs existing in the national economy and was therefore disabled.  (R. at 19).  The ALJ reasoned that Plaintiff had not met her burden of establishing disability prior to March 30, 2001.  (R. at 19).

It is undisputed that there is no evidence in the record detailing Plaintiff's mental condition prior to March 30, 2001.  Plaintiff never received any psychiatric treatment, nor did her treating physician, Dr. Mirza, ever suggest that she seek psychiatric treatment.  Plaintiff points to Dr. Mirza's note of October 6, 1998 that Plaintiff was crying and emotional; however, he made no comment on Plaintiff's overall mental condition or diagnosis.  (R. at 103).  At the hearing on December 21, 2001, some three months prior to Dr. Saleem's psychiatric examination, Plaintiff testified that she had no mental

problems and that she had never received any psychiatric treatment.  (R. at 264).

There is no evidence in the record to substantiate Plaintiff's allegation that she suffered

from mental problems prior to March 30, 2001.  As it was Plaintiff's burden to establish

such an impairment, it was proper for the ALJ to decide that Plaintiff's mental condition

constituted a disability as of March 30, 2001, but not prior thereto.  See 42 U.S.C. §

423(d)(5)(A); Reyes, 807 F. Supp. at 298.

Plaintiff argues that her physical impairments warranted a finding of disability as

of March 15, 1997, the date she was diagnosed with rheumatic aortic valvular disease

with mild to moderate aortic regurgitation, rheumatic mitral valve disease with mitral

valve prolapse and mild mitral regurgitation, and trace tricuspid regurgitation with

normal pulmonary systolic pressure.  (See R. at 107).  The ALJ specifically found that

Plaintiff's physical impairments did not prevent her from doing her past relevant work as

a cashier, finding that prior to March 30, 2001, Plaintiff retained the RFC to perform light

work.  (R. at 19).

The ALJ's decision regarding Plaintiff's cardiac impairments is supported by

substantial evidence.  Dr. Kasulke's opinion, which the ALJ gave considerable weight,

found that Plaintiff was able to frequently lift up to ten pounds, occasionally lift up to

twenty pounds, and frequently carry up to twenty pounds.  (R. at 173).  He stated that

Plaintiff had no limitations in her ability to sit, stand, or walk.  (R. at 174).  There is no

evidence in the record which contradicts this opinion.  Dr. Mirza also consistently noted

that Plaintiff's heart condition was well-controlled when she took her medication as

directed.  (R. at 104-05, 135).  Additionally, Plaintiff demonstrated a high tolerance for

18

exercise when a stress test was administered by Dr. Mirza.  (R. at 101).  Finally, the RFC Assessment performed on December 16, 1999, found that, even while eight months pregnant, Plaintiff retained the ability to occasionally lift fifty pounds and frequently lift twenty-five pounds; stand, walk, and/or sit for about six hours in an eight-hour workday; and push and/or pull to an unlimited extent.  (R. at 148).  She was assessed with the ability to frequently stoop and crouch, occasionally climb and balance, and never kneel or crawl; she had no manipulative, visual, communicative, or environmental limitations.  (R. at 149, 150-51).

Thus, substantial evidence supports the ALJ's conclusion that Plaintiff failed to meet her burden of establishing disability prior to March 30, 2001.  The Court declines to remand on this basis.

*2.  Whether the Commissioner Failed to Properly Weigh the Medical Evidence of Record and Reach a Correct Determination of Plaintiff's RFC Prior to March 30, 2001.*

Plaintiff argues that the ALJ erred in weighing the medical evidence of record, resulting in an inaccurate disability onset date and an inaccurate assessment of Plaintiff's RFC.  (Plaintiff's Br. at 12-15, 17-18).  To the extent that Plaintiff argues that her cardiac impairments warranted a finding of disability prior to March 30, 2001, the Court has already determined that substantial evidence supported the ALJ's determination that Plaintiff's cardiac impairments did not prevent Plaintiff from performing a full range of light work.  See id. Subsection (1).

Plaintiff also argues that the ALJ failed to properly consider all of the relevant medical evidence in coming to his determination, placing specific weight on the ALJ's

failure to discuss Plaintiff's migraine headache condition.  The Court finds this argument persuasive.  The ALJ's decision contains no mention whatsoever of Plaintiff's migraine headaches, which are extensively documented by objective medical evidence as well as Plaintiff's own testimony.  (R. at 94, 96, 103, 136, 230-35, 245).  Plaintiff's treating physician, Dr. Mirza, noted that Plaintiff's migraines were severe, characterized by photophobia, and on at least one occasion Plaintiff required an injection because her regular prescription medication did not alleviate her pain.  (See R. at 94, 136).

Although an ALJ is not required to specifically address each piece of evidence in his decision, see Jones v. Barnhart, 2004 WL 3158536, *6 (E.D.N.Y. 2004) (citing Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984)), the ALJ must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not severe.  See 42 U.S.C. § 423(d)(2)(B); 20 C.F.R. § 404.1545.  There is ample evidence in the record that Plaintiff suffers from migraine headaches, which appear to have more than a minimal impact on her ability to do work-related activities.  The ALJ's failure to address all of Plaintiff's impairments when reaching his decision constituted application of an incorrect legal standard.  Regardless of whether substantial evidence supports an ALJ's decision, where a reasonable basis for doubt exists as to whether correct legal principles were applied, the ALJ's decision may not be affirmed.  Johnson v. Bowen, 817 F.2d at 986.  Thus, the Court remands the case to the Commissioner for further consideration of how Plaintiff's full range of impairments impacted her disability status.

*3.  Whether the Commissioner Failed to Properly Assess the Severity of Plaintiff's Migraine Headaches.*

20

Plaintiff next argues that the ALJ failed to properly assess the severity of her migraine headaches.  (Plaintiff's Br. at 15-17).  Defendant disagrees, and argues that the ALJ properly decided that Plaintiff's migraine headaches were not severe. (Defendant's Br., Dkt. No. 12, at 14-15).  Defendant argues that the evidence of migraine headaches in the record was so insubstantial as to warrant the ALJ in failing to consider Plaintiff's migraines severe.  Contrary to the Defendant's contention, however, the ALJ altogether failed to assess the severity of Plaintiff's migraines.

The concept of severity under the regulations is applied as follows:

> An impairment or combination of impairments is found 'not severe' and a finding of 'not disabled' is made . . . when medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work even if the individual's age, education, or work experience were specifically considered . . . *Great care should be exercised in applying the not severe impairment concept.*  If an adjudicator is unable to determine clearly the effect of an impairment or combination of impairments on the individual's ability to do basic work activities, the sequential evaluation process should not end with the not severe evaluation step.  Rather, it should be continued . . .

Gonzalez v. Chater L 204512, *2 -3 (E.D.N.Y.,1996) (citing Social Security Ruling 85-28; Bowen v. Yuckert, 482 U.S. 137, 154 n.12 (1987)).

As discussed above, Plaintiff's migraine headaches were not even considered in the ALJ's analysis.  However, the evidence establishes that Plaintiff's migraine headaches were an ongoing condition for which she received continuing treatment. (See R. at 94, 96, 103, 136, 230-35, 245).  On remand, the ALJ should assess the severity of Plaintiff's migraine headaches when considering Plaintiff's overall disability status.

*4. Whether the ALJ Erred in Assessing Plaintiff's Credibility.*

Plaintiff next argues that the ALJ inappropriately assessed her credibility. (Plaintiff's Br. at 19-21).  The ALJ has discretion to appraise the credibility of witnesses, including testimony of a plaintiff concerning subjective complaints of pain.  See Mimms v. Heckler, 750 F.2d 180, 185-86 (2d Cir. 1984).  After considering a claimant's subjective testimony, the objective medical evidence, and any other factors deemed relevant, the ALJ may accept or reject a claimant's subjective testimony.  20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4) (2007); Martone, 70 F. Supp. 2d at 151.

If the ALJ rejects a claimant's subjective testimony, he or she must explicitly state the basis for doing so with sufficient particularity to enable a reviewing court to determine whether those reasons for disbelief were legitimate, and whether the determination is supported by substantial evidence.  Martone, 70 F. Supp. 2d at 151 (citing Brandon v. Bowen, 666 F. Supp. 604, 608 (S.D.N.Y. 1987).  Where the ALJ's findings are supported by substantial evidence, the reviewing court must uphold the ALJ's decision to discount Plaintiff's subjective complaints of pain.  Aponte v. Sec'y, Dep't of Health & Human Servs., 728 F.2d 588, 591 (2d Cir. 1984) (citing McLaughlin v. Sec'y of Health, Educ. & Welfare, 612 F.2d 701 (2d Cir. 1980).

In his decision, the ALJ found Plaintiff's testimony not fully credible because it was not consistent with evidence of Plantiff's daily activities and with the objective medical evidence in the record.  (R. at 18).  The ALJ noted that Plaintiff cared for her son, helped her husband get ready for work, watched television, did some household chores, went shopping with her husband, and cooked.  (R. at 163, 247-48).  Moreover,

22

medical evidence and treatment notes from Dr. Mirza indicated that when Plaintiff took her cardiac medications regularly, her symptoms were well-controlled.  (See R. at 104-05, 135).

The ALJ's analysis of Plaintiff's credibility is thorough and the ALJ's reasons for discounting Plaintiff's credibility are apparent from a review of the decision.  Thus, the ALJ did not improperly assess Plaintiff's credibility.

## IV.  CONCLUSION

This Court REVERSES the final decision of the Commissioner of Social Security and REMANDS the case for further consideration.

IT IS SO ORDERED.

Dated: December 20, 2007

Howard G. Munson
Senior  U.S. District Judge

23